UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 20-CV-2325

| | |
|---|---|
| Ericka KHOUNEDALETH, ) | |
| ) | |
| Plaintiff, ) | COMPLAINT |
| ) | SEEKING |
| v. ) | MONETARY |
| ) | DAMAGES, |
| CITY OF MINNEAPOLIS, a ) | DECLARATORY |
| municipal entity; Officer DOE #1, in ) | JUDGMENT, |
| their individual and official capacity; ) | INJUNCTIVE |
| and Officer DOE #2, in their ) | RELIEF |
| individual and official capacity, ) | |
| ) | |
| Defendants. ) | DEMAND FOR |
| ) | JURY TRIAL |
| ) | |

## **GENERAL INTRODUCTION**

1.  This is an action under 42 U.S.C. § 1983 seeking monetary damages as

    compensation for Defendants' violations of Plaintiff's constitutional

    rights under the First, Fourth, and Fourteenth Amendments to the

    United States Constitution. Plaintiff also seeks declaratory and

    injunctive relief.

2.  Additionally, this action states common law battery, negligence, and

    negligent inflection of emotional distress claims pursuant to MINN.

    STAT. § 466.02 against two police officers whose identities are not yet

    known, but who are referred to in this Complaint as Officer Doe #1 and

Officer Doe #2 (collectively, "Officers Doe" or "Doe Defendants") in their individual *and* official capacities (differentiated by claim), and against the City of Minneapolis, Minnesota for the actions of its agents and employees Minneapolis Mayor Jacob Frey, Minneapolis Police Chief Medaria Arradondo.

3.  Jurisdiction is based upon 28 U.S.C. §§ 1331, 1343, 1367, 1651, 2201; claim joinder is appropriate under Fed. R. Civ. P. 18.

4.  It is alleged that on May 31, 2020, one or both Doe Defendants, engaged in an action which resulted in the unreasonable seizure of Plaintiff, thereby violating her rights under the Fourth Amendment to the United States Constitution, as made applicable to the States by the Fourteenth Amendment, as well as her rights to Due Process and Equal Protection under the Fourteenth Amendment.

5.  Defendants violated Plaintiff's constitutional rights because of, *inter alia*, the policies or customs of the City of Minneapolis and the Minneapolis Police Department, under the supervision of Minneapolis Police Chief Medaria Arradondo and Minneapolis Mayor Jacob Frey.

6.  On May 31, 2020, Defendant City of Minneapolis, through Minneapolis Mayor Jacob Frey, mandated a city-wide curfew and thereby engaged in action that unconstitutionally deprived Plaintiff of her rights under the First Amendment to speak and assemble, as made applicable to

the states through the Fourteenth Amendment, and of her right to be present in public under the Fourteenth Amendment.

7.  In enforcing the mandated curfew on May 31, 2020, Defendant City of Minneapolis, through its agents, including Police Chief Medaria Arradondo and Doe Defendants, unconstitutionally deprived Plaintiff of her rights under the First Amendment to speak and assemble, as made applicable to the states by the Fourteenth Amendment, and of her right under the Fourteenth Amendment to be present in public.

8.  One or both Doe Defendants committed a common law battery against Plaintiff for which the City of Minneapolis must assume liability under MINN. STAT. § 466.02 and/or MINN. STAT. § 3.736.

9.  Officers Doe breached their duty of reasonable care to (1) conduct the arrest of Plaintiff in a constitutionally permissible manner and (2) to not unnecessarily harm Plaintiff in the execution of her arrest. Officers Doe breached this duty by pulling Plaintiff from her vehicle and deploying tear gas in an act of common law negligence for which the City of Minneapolis must assume liability under MINN. STAT. § 466.02 and/or MINN. STAT. § 3.736.

## PARTIES

### Plaintiff: Ericka Khounedaleth

10.  Plaintiff Ericka Khounedaleth [hereinafter "Ericka"] was among those who assembled to peacefully protest the killing of George Floyd on May 31, 2020.

11.  Ericka is a twenty-year-old administrative accounting assistant and a business student at North Hennepin Community College. She resides in Plymouth, Minnesota.

### Defendant: City of Minneapolis

12.  Defendant City of Minneapolis [hereinafter "Minneapolis" or "the City"] is a municipal corporation duly organized and existing under the Constitution and laws of the State of Minnesota.

13.  The Minneapolis Police Department [hereinafter "MPD"] is a local government entity and an agency of Defendant Minneapolis, and all actions of the MPD are the legal responsibility of Minneapolis.

14.  Minneapolis is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiff's federal rights claims.

15.  Minneapolis Mayor Jacob Frey [hereinafter "Frey"] is, and was at all times relevant to this action, the Mayor of Minneapolis and the chief

policymaker responsible for implementing curfew orders and
authorizing MPD's use of force.

16. Minneapolis Police Chief Medaria Arradondo, [hereinafter
"Arradondo"] is, and was at all times relevant to this action, the MPD
police chief and a policymaker for his department.

## **Defendants: Minneapolis Officers Doe 1 and 2**

17. Ericka is informed, believes, and thereupon alleges that Officers Doe
1 and 2 were the agents, servants, and employees of Defendant
Minneapolis and/or the MPD.

18. These individuals were likely members of the MPD, though they may
have been operating in Minneapolis at the direction of the Mayor and
Governor under the auspices of another law enforcement agency.

19. Ericka does not yet know the true names and capacities of
Defendants sued herein as Doe 1 and 2 and therefore sues these
Defendants by such fictitious names. Plaintiff will amend this
Complaint to allege their true names and capacities when
ascertained.

20. Both individual Doe Defendants are sued in both their individual and
official capacities.

21. For purposes of Plaintiff's claims under 42 U.S.C. § 1983, Doe
Defendants are sued in their *individual* capacity. While Plaintiff also

faults Doe Defendants for the actions they performed in their *official* capacity, these harms are imputed to the City of Minneapolis and need not be realleged.

22. For purposes of Plaintiff's claims under § 42 U.S.C § 1983 against the City of Minneapolis, Defendants are sued in their *official* capacity.

23. For purposes of Plaintiff's state law claims, Doe Defendants are sued in their *official* capacity only.

24. Ericka is informed, believes, and thereupon alleges that Officers Doe 1 and 2, in addition to the named Defendants, are factually and proximately responsible for the damages and injuries alleged herein.

25. Ericka is informed, believes, and thereupon alleges that, at all times relevant hereto, Doe Defendants were the agents, servants, and employees of Defendant Minneapolis and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer.

26. At all times Doe Defendants were acting under color of state law.

27. Ericka is informed, believes, and thereupon alleges that the practices, policies, and customs of Minneapolis and/or the MPD caused the unlawful action taken against Ericka.

## JURISDICTION

28.   This Court has jurisdiction under 28 U.S.C. § 1331 (federal question
      jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), 28 U.S.C. §
      1651 (All Writs Act), 28 U.S.C. § 2201 (declaratory judgment), and 42
      U.S.C. §§ 1983, 1988. Supplemental jurisdiction over state claims is
      appropriate as the events in question "derive from a common nucleus of
      operative fact." 28 U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs*,
      383 U.S. 715, 725 (1966).

## VENUE

29.   Venue properly lies in the District of Minnesota under 28 U.S.C. §
      1391(e)(1) because all the events giving rise to this claim occurred in
      this district, all Defendants reside in this district, and no real property
      is involved in this action.

## FACTUAL BACKGROUND

30.   On May 25, 2020, Minneapolis Police Officer Derek Chauvin knelt on
      George Floyd's neck for more than eight minutes as Mr. Floyd's life
      slowly slipped away. Despite Mr. Floyd's pleas for help and the
      protestations of onlookers, Officer Chauvin and two other officers held
      him on the ground, handcuffed, until well after he completely stopped
      moving, while a fourth officer prevented bystanders from intervening to
      save Mr. Floyd's life. Mr. Floyd died on the street in Minneapolis. He

was suspected of attempting to pass a counterfeit $20 bill. These officers have since been indicted for aiding or abetting murder in the second degree in violation of MINN. STAT. § 609.19.

31. On May 26, 2020, thousands of Minneapolis residents took to the City's public streets and spaces to protest the killing of Mr. Floyd, as well as police killings of other people of color. As city officials acknowledged, the vast majority of these protesters exercised their First Amendment rights in a forthright, peaceful, and lawful manner.

32. On the evening of May 27, 2020, the Minneapolis Fire Department responded to several fires that occurred in the vicinity of the Third Precinct, along Lake Street near the intersection with Hiawatha Avenue. Mayor Frey responded by declaring a state of emergency, citing fires and unrest near the Third Precinct and in the surrounding area.

33. On May 28, 2020, the Fire Department again responded to a number of fires along Lake Street in the vicinity of the Third Precinct. Several additional fires also broke out in the vicinity of Broadway Avenue on the City's north side.

34. In total, all the building fires experienced throughout Minneapolis and the vast majority of the property crimes that prompted the order were confined to two discrete areas: around Lake Street on the south side,

and Broadway Avenue on the north side. Together, these areas constituted about four of Minneapolis's fifty-eight square miles.

35. On May 31, 2020, Mayor Frey issued Emergency Regulation 2020-2-2, implementing a city-wide curfew between the hours of 8:00 PM on May 31, 2020 and 6:00 AM on June 1, 2020.

36. This order, in tandem with similar measures, ultimately mandated that all Minneapolis residents throughout the city stay off the streets for several consecutive evenings despite the fact that the fires and unrest that prompted the orders were largely confined to two relatively discrete areas.

37. In issuing the order, officials acknowledged that peaceful protesters would be caught up in the enforcement and indicated that anyone out beyond the curfew would be treated as if they were aiding and abetting those seeking to do property damage.

38. Minneapolis officials characterized the outright criminalization of First Amendment activity and MPD's violent enforcement of the curfew order as necessary to restore order.

39. Over the full period in which the curfews were in effect, and the two days prior, half of Minneapolis's eighty-seven neighborhoods experienced no fire activity, protest-related or otherwise.

40.  Fifty-three of Minneapolis's eighty-seven neighborhoods experienced no building fires.

41.  At the time Mayor Frey issued Emergency Regulation 2020-2-2, he acted under the color of the statutes, ordinances, regulations, customs, and usages of Defendant Minneapolis and the State of Minnesota under the apparent authority of his office as Mayor and MINN. STAT. § 12.29.

## The Assault of Ericka Khounedaleth

42.  Plaintiff Ericka Khounedaleth attended one of the protests in the aftermath of Mr. Floyd's death in an effort to exercise her constitutional rights to assemble, to make known and voice her displeasure with the violence perpetrated by MPD officers against people of color and particularly against African American men.

43.  Ericka attended this protest with Kim Huynh [hereinafter "Kim"] and Rachel Scoggins [hereinafter "Rachel"], who sought the same peaceful, yet powerful, aims as Ericka.

44.  Ericka was injured by police officers on May 31, 2020.

45.  On May 31, 2020, Ericka, Kim, and Rachel arrived in downtown Minneapolis around 6:30 PM.

46.  Ericka parked facing north on Chicago Ave., between 6:30 and 7:00 PM. The group planned to hand out milk and water to protesters as needed.

47.   Ericka, along with Kim and Rachel, decided to stay in the car for the duration of their time at the protest.

48.   Ericka drove east on Washington Avenue, following traffic and the crowd of protesters as they marched.

49.   By approximately 8:00 PM, police officers had created a barricade, blocking travel to the eastern side of Washington Avenue.

50.   Around 8:00 PM, Ericka noticed that police had blocked off eastern Washington Avenue and tension was building in the area. Ericka saw one car attempt to continue past the police barricade; police slashed the car's tires.

51.   The blockage made it impossible for Ericka to continue eastbound on Washington Avenue, forcing her to turn around and seek an exit elsewhere.

52.   If Mayor Frey's emergency regulation, or Minnesota Governor Tim Walz's Emergency Exec. Order No. 20-68, were themselves lawful, Ericka's presence on the street after 8:00 PM was punishable as a misdemeanor by up to ninety days in jail or a $1,000 fine. *See* MINN. STAT. § 12.45; MINNEAPOLIS, MINN., CODE OF ORDINANCES § 1.30.

53.   Ericka made a U-turn around 8:10 PM to avoid the police barricade. She then got stuck on westbound Washington Avenue as police officers blocked the street and approached from all sides.

54.   From this point forward, Ericka was attempting to leave the area and return home.

55.   Two additional individuals, who knew Rachel, were protesting in the area. They joined Ericka, Rachel, and Kim in the car in order to leave the scene.

56.   Ericka slowly moved the vehicle forward when she saw a flash grenade, and she watched several other cars divert into a parking lot north of Washington Avenue.

57.   Ericka followed these cars into the parking lot because there was an exit that was not blocked by the police.

58.   As Ericka approached the parking lot entrance, officers began moving toward the exit. Ericka watched officers allow two vehicles through the exit without confrontation.

59.   When Ericka neared the exit, officers approached her vehicle with weapons raised.

60.   Since this event occurred, it has become known that Mayor Frey and the City of Minneapolis selectively enforced the curfew orders, granting informal exemptions to certain individuals and organizations.

61.   Ericka put the car in reverse but did not move, leaving her foot on the brake. She told everyone in the car to put their hands up and comply with the officers.

62.   Officers Doe 1 and 2 approached the driver's side door of the vehicle. The car door was unlocked, and Ericka was not wearing a seatbelt.

63.   Without telling Ericka what they were going to do, and without first requesting that Ericka exit the car, one of the officers pulled open the door, grabbed Ericka tightly by her right shoulder, and forcibly removed Ericka from the vehicle.

64.   As Ericka was pulled from the car and thrown to the ground, the other officer stood by and watched.

65.   Because the car was still in reverse, the car jolted backward. One of the officers got into the vehicle and put it in park.

66.   While Ericka was on the ground, one of the officers deployed tear gas. She felt the effects of the tear gas immediately; she felt burning pain, had difficulty breathing, and was terrified.

67.   Officers Doe 1 and 2 yelled for Ericka to get up. Both had their guns drawn and aimed at Ericka's head. The officers grabbed Ericka, one by each arm, and dragged her to her feet. She had difficulty walking, and the officers dragged her several feet before pushing her toward a group of other protesters.

68.   Ericka stood with the other protesters for about ten minutes before they were all told to lie face down.

69. Officers then began arresting the protesters with Kwik-cuffs (i.e. plastic zip ties). Ericka's cuffs were extremely tight on her wrists.

70. The protesters sat in the parking lot for approximately two hours while waiting to board a transport bus.

71. Ericka was finally instructed to board a Metro Mobility bus around 10:45 PM.

72. The bus was supposed to be only female arrestees, but one male was present on the bus. Passengers were tightly packed, sitting shoulder to shoulder, and sharing seats. Most passengers were not wearing masks because the tear gas had gotten on their COVID-19 prevention masks, thereby rendering the masks unwearable. These conditions were unequivocally contrary to the local government's policies and recommendations in preventing the spread of COVID-19.

73. Ericka and the other protesters sat on the Metro Mobility bus for over an hour, the majority of which was spent stopped in front of the Hennepin County Government Center, before driving to a parking garage.

74. At the parking garage, Ericka, Kim, and Rachel were transferred to a male-passenger coach bus and were then driven to the Hennepin County Jail.

75.     Ericka was issued a citation for unlawful assembly and curfew
        violation. She was finally released around 1:30 AM on June 1, 2020.
        The charges on the citation were dismissed by the State of Minnesota,
        acting through the Office of the Minneapolis City Attorney, on July 23,
        2020.

76.     Doe Defendants did not tell Ericka to exit the vehicle before using force.

77.     At no point prior to the confrontation did Doe Defendants verbally
        notify Ericka of their presence or intention to arrest her.

78.     At no point prior to the confrontation did Doe Defendants seek to
        determine whether Ericka and her passengers were lawfully out after
        curfew (the emergency declarations contained various exceptions which
        would make it impossible for an officer to determine on sight whether
        someone out after curfew was violating the curfew order).

79.     At no point prior to the confrontation did Ericka or any of her
        passengers move towards the officers in a threatening manner.

80.     At no point prior to the confrontation did Ericka engage in conduct
        which could be construed as an attempt to damage property or threaten
        the safety of any person.

81.     At no point prior to pulling Ericka from the car did officers move to
        effect an arrest of her or to apprehend her.

82.   Doe Defendants did not verbally identify any alleged violation of law
      prior to or during their apprehension of Ericka.

83.   Plaintiff was given no chance to surrender, peacefully or otherwise,
      before tear gas was deployed.

84.   Despite Ericka's lack of resistance or unlawful activity, tear gas was
      deployed against her during a global respiratory-based pandemic
      without any regard for Ericka's safety or respiratory health.

85.   At no point before, during, or after being apprehended was Ericka read
      her *Miranda* rights.

86.   At all times mentioned, Doe Defendants were acting under the color of
      the statutes, ordinances, regulations, customs, and usages of Defendant
      Minneapolis and the State of Minnesota under the authority of their
      respective offices as police officers.

87.   MINN. STAT. § 629.32 instructs that "[a] peace officer making an arrest
      may not subject the person arrested to any more restraint than is
      necessary for the arrest and detention." Accordingly, Minnesotans have
      a liberty interest in freedom from the use of excessive force grounded in
      substantive state law.

88.   MINN. STAT. § 629.33 instructs that "[i]f a peace officer has *informed* a
      defendant that the officer intends to arrest the defendant, *and if* the
      defendant then *flees or forcibly resists* arrest, the officer may use all

necessary and lawful means to make the arrest." (emphasis added). Accordingly, Minnesotans have liberty interests in being informed prior to being subjected to police force and to be free from such force unless they resist or attempt to flee. Both of these liberty interests are grounded in substantive state law.

89.     MPD recently revised its policies to make clear that the least amount of force necessary must be used; this new policy indicates that MPD's previous policies allowed excessive force to be used in violation of state statute.

90.     According to *Goyette v. City of Minneapolis*, No. 20-CV-1302 (WMW/DTS), 2020 WL 3056705, at *2 (D. Minn. June 9, 2020), "the Minnesota State Patrol has not used chemical irritants or less-lethal munitions to try and maintain order and safety since May 31, 2020." This statement shows that the Minnesota State Patrol was using chemical irritants on May 31, 2020. This statement also shows that Minnesota State Patrol understands that chemical irritants are not appropriate for use against non-violent, non-aggressive protesters or misdemeanants.

## MPD's Customary Use of Excessive Force Against Unarmed and Compliant Civilians

91. Minneapolis enforced the emergency order through a massive deployment of National Guard troops and a consortium of law enforcement agencies, all of whom were authorized to use force against anyone outdoors after curfew regardless of whether such use of force was necessary to gain compliance.

92. Even before curfew was in place, MPD officers maced protesters from their vehicles without warning and despite an absence of threat or justifiable provocation. This occurred on multiple occasions including on May 28, involving Annette Williams, and by a series of MPD police SUVs including vehicle number 352 during broad daylight while exiting Washington Avenue onto Interstate 35W.

93. During the enforcement of the curfew, police officers deployed tear gas against prone, nonresistant persons alleged (but not shown) to be misdemeanants.

94. During the enforcement of the curfew, Minneapolis police officers fired "less lethal" projectiles indiscriminately into crowds of peaceful protesters on May 30, 2020.

95.   During the enforcement of the May 30, 2020 curfew, police officers fired "less lethal" paint projectiles at Tanya Kerssen as she stood on her own porch despite an absence of threat or justifiable provocation.

96.   During the enforcement of the curfew, police officers attacked protesters from moving vehicles on May 30, 2020.

97.   On May 30, 2020, police opened fire with "less lethal" projectiles on a clearly marked medical encampment set up to treat injured individuals in the K-Mart parking lot located at 10 W. Lake Street, Minneapolis, MN 55408, despite health care providers compliance with orders to raise their hands.

98.   During the enforcement of the curfew, police officers fired "less-lethal" projectiles at clearly marked press personnel despite a clear exception permitting their presence in public.

99.   Members of the press who were attacked by police officers during this time include, *inter alia*: John Minchillo (May 29, 2020), Molly Hennessy-Fiske (May 30, 2020), Michael George (May 30, 2020), John Marschitz (May 30, 2020), Carolyn Cole (May 30, 2020), Ryan Faircloth (May 30, 2020), Chao Xiong (May 30, 2020), Linda Tirado (May 30, 2020), Ali Velshi (May 30, 2020), Julio-Cesar Chavez (May 30, 2020), Lucas Jackson (May 30, 2020), and Susan Ormiston (May 30, 2020). *See also Goyette*, 2020 WL 3056705, at *2 ("Goyette

contends that 'the MPD and the State Patrol have engaged in alarming, aggressive tactics to harm and intimidate credentialed, or otherwise identifiable members of the news media providing on-the-scene coverage' of the events following Floyd's death. Goyette alleges that several members of the news media, after identifying themselves as members of the press, have been arrested, threatened, shot with rubber bullets, or subjected to chemical irritants.").

100.   During the enforcement of the curfew, police officers kettled[1] protesters to prevent their dispersing before curfew and then moved in to arrest them, striking protesters with batons and assaulting protesters with chemical irritants. This occurred on May 31, 2020 near the intersection of Washington Avenue and Interstate 35W where nearly 150 protesters were prevented from dispersing before curfew and subsequently gassed and arrested en masse.

101.   During the enforcement of the curfew, police officers held arrestees in close proximity to one another despite the government's own social distancing guidelines implemented in response to the COVID-19 pandemic.

---

[1] "Kettling" is a law enforcement tactic by which officers encircle a group of protesters without providing a means of egress. *See, e.g.*, *Ziegler v. City of St. Louis, Missouri*, 2020 WL 709257, at *1 n.1 (E.D. Mo. Feb. 12, 2020).

102.  These actions were widely reported by local, regional, and national news outlets, and through social media; Mayor Frey and Chief Arradondo were aware of the ongoing excessive force complaints.

103.  Photojournalist Lucas Jackson reported "[i]t's not that we were being shot because we were between cops and protesters. It's that we were shot at if we were anywhere in line of sight.  I've been hit because I was in the wrong place before.  I've never been aimed at so deliberately so many times when I was avoiding it."

104.  Mayor Frey and Governor Walz acknowledged the ongoing use of excessive force used against peaceful protesters as an unfortunate result of curfew enforcement.

105.  This massive use of force was authorized, either explicitly or tacitly, by Defendant Minneapolis through its agents: Mayor Frey and Chief Arradondo. This is evidenced through warnings issued at the time the curfew was implemented and by the pervasive use of force by MPD and other law enforcement agencies employed at all times throughout the relevant time period.

106.  Even if this use of force was not explicitly authorized by Defendant Minneapolis, it resulted from the City's failure to supervise or provide adequate instruction to their officers despite their awareness of the ongoing issues.

107.   Before May 31, 2020, the City failed to train officers adequately for responding to mass demonstrations or protests.

108.   The City failed to provide officers with adequate instruction as to what level of force was permitted or suggested in responding to alleged misdemeanor offenses by non-violent alleged misdemeanants during the City's response to the George Floyd protests that occurred between May 25, 2020 and May 31, 2020.

109.   The City's failure to provide officers with adequate instructions regarding the levels of force that are permitted or suggested in responding to the George Floyd protests that occurred between May 25, 2020 and May 31, 2020 demonstrates that the City failed to provide officers with adequate supervision during the City's protest responses.

110.   Even before the curfew regime, MPD officers have a long history of engaging in excessive force against unarmed civilians; these represent practices that MPD, and by extension Minneapolis, has long ignored and tacitly approved of.

111.   In 2010, MPD officers killed David Cornelius Smith, who was suffering a mental health breakdown, with multiple taser blasts and an overly aggressive restraint that caused him to lose consciousness. The officers involved were not criminally charged or disciplined. The Internal Affairs Unit never interviewed them.

112.  In 2013, Minneapolis resident Terrance Franklin was chased into a basement and shot dead by five MPD officers. The officers involved were not criminally charged or disciplined.

113.  In 2014, MPD officers choked, punched, and handcuffed Alfred Flowers before continuing the beating by stomping and kicking him as he laid on the ground. The officers involved were not criminally charged or disciplined.

114.  Again in 2014, former MPD officer Tou Thao beat Lamar Ferguson on the streets of Minneapolis. The officer punched, kicked, and kneed Ferguson while he was handcuffed. Ferguson's teeth were shattered, and he was hospitalized for four days. Thao would later be one of the officers involved in George Floyd's murder, and he had six police conduct complaints filed against him at the time—one remained pending and the other five were closed without discipline.

115.  In 2015, Minneapolis resident Jamar Clark was shot and killed by MPD officers. The officers involved were not criminally charged or disciplined.

116.  In 2016, Minnesota Vikings player Tom Johnson was maced and tasered after MPD officers initiated a confrontation with him. Both officers involved had been sued previously for unreasonable force.

Neither faced criminal charges or discipline for the altercation with Johnson.

117.   Again in 2016, MPD officers kicked and struck Tomas Garcia-Orihuela as he laid handcuffed on the ground. One of the officers involved had previously been named in two excessive force lawsuits.

118.   In 2017, unarmed Minneapolis resident Justine Ruszczyk was shot and killed in her backyard by former MPD officer Mohamed Noor. Noor became the only law enforcement officer ever convicted of murder for an on-duty incident in the state of Minnesota.

119.   In 2018, an MPD officer drop-kicked Jeremiah Jermaine Thomas in the chest before additional MPD officers joined in, punching, kneeing, and kicking him and causing a punctured lung, internal bleeding, and fractured ribs.

120.   In all of these cases, settlements were reached, meaning Defendant Minneapolis was on notice of MPD's ongoing pattern of reckless violence, as the Mayor is notified of all litigation brought against the City and must approve all settlements.

121.   In 2019, MPD officers repeatedly tasered Champaigne Lynn Hale and Leonadis John Evans in their backyard, in what was described as a police riot, prompting the county to drop criminal charges against the women. The event was widely reported.

122. Impunity is the norm. Of the 2,013 complaints filed against MPD officers in the past seven years, only 31, or 1.5 percent, ended in serious discipline.

123. Derek Chauvin, the former MPD officer responsible for the death of George Floyd, personifies MPD's failure to discipline officers. Before May 25, 2020, at least eighteen complaints were filed against Chauvin, many of which alleged misconduct or excessive force, but only two of those complaints were closed with discipline. This pattern of inadequate discipline for unlawful actions extends throughout the entirety of the MPD.

124. MPD's culture accepts and allows the use of excessive force as a customary part of the job.

125. All MPD officers are represented by the Police Officer's Federation of Minneapolis. The federation provides union representation to all officers and negotiates on their behalf with the City.

126. The federation's elected president, Lieutenant Robert Kroll ("Kroll"), acts as an unofficial policymaker within the MPD. As the president of the union, Kroll is an important culture maker in the department, and he acts as a de facto policymaker for many of the officers. As president, he is elected by MPD officers. Their affirmative choice of him as a leader sheds light on the culture of the department.

127. Kroll's statement to federation members, on June 2nd, underscores his influence throughout the department:

> What has been very evident throughout this process is you have lacked support from the top. I've noted in press conferences from our mayor, our governor, and beyond, how they refuse to acknowledge the work of MPD and continually shift blame to it.  It is despicable behavior.  How our command staff can tolerate it and live with themselves I do not know… Although I have not been visibly present, I am closely monitoring what is occurring.  I commend you for the excellent police work you are doing… I've had numerous conversations with politicians at the state level. I gave a detailed plan of action including a range of 2000 to 3000 National Guard, their deployment allocations throughout our city and St. Paul, in a phone meeting with Senate majority leader Paul Gazelka. I've worked with other police leaders from New York to Las Vegas to push our messaging on a national level.

These are not the words of a standard lieutenant; they are the words of a man who sets the tone and culture for the department.

128. Kroll is a member of the City Heat motorcycle club, which has been known to regularly display white supremacist symbols.

129. Minneapolis permitted so-called "warrior training," which prepares police to do battle with civilians, until 2019.

130. After 2019, the Police Federation, headed by Kroll, offered free warrior training to Minneapolis officers. The union was not subject to censure or reprimand for engaging in this conduct.

131. No efforts were made to prevent officers from engaging in warrior training programs despite a clear awareness regarding its popularity amongst officers and Minneapolis officials' awareness of the propensity to result in violence perpetuated towards citizens.

## INJURIES

132. At minimum, the injuries Ericka suffered rise to the level of "bodily harm," as that term is defined by MINN. STAT. § 609.02, subd. 7.

133. Ericka suffered injuries to her knee and wrists as a result of being forcibly removed from her vehicle and placed in restraints for over five hours on May 31, 2020 and the early hours of June 1, 2020.

134. Ericka was also exposed to unnecessary and excessive physical and emotional pain and suffering as a result of Officers Doe 1 and 2's use of chemical irritants against Ericka during the course of her arrest.

135. As a result of her injuries from May 31, 2020, Ericka suffered damage to the nerves in her wrist, making it incredibly difficult to use her hands. The pain in her wrists persisted for nearly a week.

136. Prior to May 31, 2020, Ericka had never had nerve damage to her wrists.

137. Ericka experienced daily headaches for weeks following the incident. These headaches made her sensitive to smell and motion.

138.  Ericka has experienced anxiety after the incident, as a direct result of the incident, and she continues to experience periods of hyperventilation and general anxiety with sudden movements or sounds and at the sight of police officers.

139.  Ericka has experienced trouble sleeping in the aftermath of the incident. She frequently suffers from night terrors and avoids sleeping due to fear of nightmares involving the incident or police officers.

140.  The incident has made Ericka extremely hesitant to call the police if she were to need them and it has engendered in her a serious distrust of officers. In this manner, it has deprived her of equal access to justice and protection.

141.  The incident has also triggered Post-traumatic Stress Disorder ("PTSD") and depression symptoms in Ericka, and she has difficulty concentrating. This affects her emotional well-being and her ability to perform as a student.

142.  As a result of these emotional injuries, Ericka was unable to enroll in classes at North Hennepin Community College for Fall Semester 2020. She was previously on track to graduate at the end of that semester.

143.  Ericka has suffered extreme emotional distress, in the form of pain and suffering, as a result of Defendants' intentional actions.

## CLAIMS FOR RELIEF

144. Doe Defendant 1, Doe Defendant 2, or both Doe Defendants 1 and 2's unprompted, unnecessary, and unannounced use of force violated Ericka's Fourth Amendment right to be free from unreasonable seizures.

145. Doe Defendant 1, Doe Defendant 2, or both Doe Defendants 1 and 2's unprompted, unnecessary, and unannounced use of force violated Ericka's Fourteenth Amendment rights to substantive and procedural Due Process.

146. Defendant Minneapolis's policies and customs of encouraging and tacitly approving of known and excessive force were the moving force behind Doe Defendants' conduct in a manner sufficient for liability to attach under *Monell* and *Canton. See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978).

147. Doe Defendant 1, Doe Defendant 2, or both Doe Defendants 1 and 2's unprompted, unnecessary, and unannounced use of force constitutes a common law battery under Minnesota tort law.

148. Doe Defendant 1, Doe Defendant 2, or both Doe Defendants 1 and 2's unprompted, unnecessary, and unannounced use of force resulted in a

breach of duty which constitutes common law negligence under Minnesota tort law.

149. Doe Defendant 1, Doe Defendant 2, or both Doe Defendants 1 and 2's unprompted, unnecessary, and unannounced use of force resulted in a breach of duty which constitutes common law negligence under Minnesota tort law.

150. Doe Defendant 1, Doe Defendant 2, or both Doe Defendants 1 and 2's unprompted, unnecessary, and unannounced use of force constitutes common law negligent infliction of emotional distress under Minnesota tort law.

151. Defendant Minneapolis's implementation of Emergency Regulation 2020-2-2, as well as its enforcement by Chief Arradondo and Officers Doe 1 and 2, violated Ericka's First Amendment rights to Free Speech and Assembly, and her Fourteenth Amendment rights to Due Process and Equal Protection.

## **Count 1: 42 U.S.C. § 1983 – Fourth Amendment Violation**

### (Plaintiff v. Doe 1 & Doe 2)

152. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

153.   By grabbing Ericka and throwing her to the ground, Defendant Doe 1 or 2 violated her constitutional right to be free from unreasonable seizures and excessive force.

154.   By deploying aerosolized chemical irritants against Ericka when she was compliant and non-threatening, Defendant Doe 1 or 2 violated her constitutional right to be free from unreasonable seizures and excessive force.

155.   "[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

156.   In determining what level of force, if any, is appropriate under the Fourth Amendment, the Court must look to the objective reasonableness of the officer's actions based on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

157.   Courts should also consider "the availability of alternative methods of capturing or subduing a suspect." *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014) (internal citations omitted).

158.  Nothing Ericka or her passengers did can be construed as a threat to
      Officers Doe 1 or 2.

159.  Ericka and her passengers were suspected of nothing more than
      violating curfew, a misdemeanor offense.

160.  Ericka did not flee nor advance towards officers when they
      approached her vehicle with weapons drawn.

161.  Due to precedent indicating that Doe Defendants' conduct was
      unreasonable, Doe Defendants were aware of the unlawful nature of
      their conduct.

162.  Because of this notice, and because of the unreasonable nature of their
      conduct, Doe Defendants are not entitled to qualified immunity.

163.  Moreover, "a state actor may be liable for an unreasonable seizure
      under the Fourth Amendment if he fails to intervene to prevent the
      unconstitutional use of excessive force by another official." *Krout v.
      Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009).

164.  The officer who did not forcibly remove Ericka from her car is also
      liable for their failure to intervene when their fellow officer did not
      announce themselves, seek to apprehend Ericka or her passengers, or
      render aid.

165.  Ericka suffered serious harm as a direct and proximate result of
      Defendants' actions including, but not limited to, physical injury,

financial injury, emotional trauma, loss of access to justice, and pain and suffering.

166. Thus, Defendants violated the Fourth Amendment and 42 U.S.C. § 1983.

### Count 2: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Ericka's Substantive Due Process Rights

(Plaintiff v. Doe 1 & Doe 2)

167. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

168. When a defendant acts deliberately, an objective standard is appropriate in the context of excessive force claims brought pursuant to the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015).

169. Whether the force used against an individual violated substantive Due Process rights under the Fourteenth Amendment turns on "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

170.   Ericka made no effort to resist officers, made no motion towards Doe 1
       or 2, and did not carry or appear to carry anything that suggested she
       might be armed.

171.   Ericka suffered immense pain and suffering, and lasting psychological
       injuries as a result of being pulled from her vehicle and tear-gassed.

172.   Officers Doe made no attempt to de-escalate the confrontation and
       instead resorted immediately, and without warning, to the use of
       excessive force.

173.   Ericka was trying to return home and leave the scene of the protest
       and carried nothing that could be construed as a weapon.

174.   Ericka was inside her vehicle and made no movement toward Doe
       Defendants and did not resist officers in any way.

175.   Ericka suffered serious harm as a direct and proximate result of
       Defendants' actions including, but not limited to, physical injury,
       financial injury, emotional trauma, loss of access to justice, and pain
       and suffering.

176.   Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C.
       § 1983.

## <u>Count 3: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Ericka's Right to Procedural Due Process</u>

(Plaintiff v. Doe 1 & Doe 2)

177.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

178.   "[S]tate statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Buckley v. Ray*, 848 F.3d 855, 864 (8th Cir. 2017).

179.   Ericka had such a liberty interest created by MINN. STAT. § 629.33 to be informed that she was subject to seizure before the arresting officer applied any force in seizing her.

180.   Ericka had a liberty interest in freedom from the use of *any* force by a police officer unless she fled or forcibly resisted. *Id.*

181.   Ericka also had a liberty interest under MINN. STAT. § 629.32 to be free from "any more restraint than is necessary for [her] arrest and detention."

182.   Both of these interests relate to Ericka's constitutional right to be free from physical seizure without due process of law, a right which is amongst the most important rights guaranteed by the U.S. Constitution.

183.   While procedural "[d]ue process is flexible and calls for such
       procedural protections as the particular situation demands," by failing
       to inform Ericka of their intention to seize her, Doe Defendants
       deprived Ericka of any process whatsoever. *Mathews v. Eldridge*, 424
       U.S. 319, 334 (1976) (internal citations omitted).

184.   Given that the statutes in question demand she be given notice and
       satisfy particular criteria prior to having her person forcefully seized,
       she was due, at the very least, notice of the officers' intent to seize her
       as required by state statute. *See* MINN. STAT. § 629.33.

185.   The use of physical force by ambush and under color of law is not
       consistent with even the most basic principles of procedural Due
       Process.

186.   Even if Ericka had been notified that she was about to be placed
       under arrest, she did not flee or pose any reasonably objective threat
       to officers, and accordingly, she was deprived of her liberty interest in
       freedom from the use of force under MINN. STAT. §§ 629.33 and 629.32.

187.   As force is only authorized in the event of flight or forceful resistance,
       it was not necessary in Ericka's case and, accordingly, being pulled
       from her vehicle and tear-gassed was unnecessary, and such actions
       infringed upon her liberty interests in freedom from forceful seizure.

188.   Ericka suffered serious harm as a direct and proximate result of Defendants' actions including, but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

189.   Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 4: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Ericka's Right to Equal Protection

(Plaintiff v. Minneapolis, Doe Defendants 1 & 2)

190.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

191.   "No State shall make or enforce any law which shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

192.   "[T]he Constitution prohibits selective enforcement of the law … [and] the constitutional basis for objection to intentionally discriminatory application of laws is the Equal Protection Clause…" *Johnson v. Crooks*, 326 F.3d 995, 999 (8th Cir. 2003) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

193.   Any alleged violation of law by Ericka was similarly applicable to the two cars that exited the parking lot ahead of her.

194.  Despite their otherwise similar situation, Officers Doe did not apprehend the other cars but singled out Ericka who is a minority.

195.  Selective enforcement is prohibited and the disparate treatment demonstrates discriminatory effect, the actions of Doe Defendants infringed upon Ericka's right to Equal Protection under the law. Ericka's rights to Equal Protection were denied on account of race and on account of her choosing to exercise her fundamental rights.

196.  Ericka suffered serious harm as a direct and proximate result of Defendants' actions including, but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

197.  Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 5: *Monell* and *Canton* Municipal Liability

### (Plaintiff v. Minneapolis)

198.  For years, MPD officers have engaged in a policy and custom of using excessive force against peaceful unarmed civilians. The pervasiveness of this custom and notice to Minneapolis officials indicates it has been tacitly approved of by the City of Minneapolis.

199. This custom has included the repeated and pervasive use of tasers, "less-lethal" impact weapons, and chemical irritants against unarmed civilians posing no threat to officers.

200. During the period from May 28, 2020 to May 31, 2020, MPD officers engaged in a custom or policy of firing "less lethal" projectiles and tear gas indiscriminately at any and all civilians in Minneapolis's public spaces.

201. During the period from May 28, 2020 to May 31, 2020, MPD officers engaged in a custom or policy of using excessive force and impact weapons against suspected misdemeanants despite clear legal notice of the constitutional infirmity of such practice.

202. These customs and policies are reflected in the widespread use of force as well as warnings issued at the time suggesting that force would be used and that such practices have been authorized by Minneapolis, Mayor Frey, and Chief Arradondo.

203. Minneapolis officials, including Mayor Frey and Chief Arradondo, approved of this excessive force, either explicitly through use of force policies or tacitly given the widespread reporting of extreme violence employed by MPD. Minneapolis's failure to address the issue despite its notice constituted tacit approval at least, and potentially express authorization.

204. MPD's Policy Manual provides that the Mayor is "vested with all the powers of said city connected with and incident to the establishment, maintenance, appointment, removal, discipline, control, and supervision of its police force, subject to the limitations herein contained and the provisions of the Civil Service chapter of this Charter, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and special orders for the government of the same, and have the care and custody of all public property connected with the Police Department of the city." (MPD Policy Manual Sec. 1-301 (citing City Charter Reference-Chapter 6, Section 1)).

205. Mayor Frey and Chief Arradondo had final policymaking authority with regard to establishing written policies and training programs that govern the conduct of MPD officers performing policing functions on behalf of Minneapolis.

206. Minneapolis officials were aware of the customs and longtime *de facto* policies in place throughout MPD via settlements and media coverage but did nothing to reprimand the continued use of warrior training or, except in the most extreme cases, follow up on misconduct.

207. Minneapolis, through Chief Arradondo, and Mayor Frey exhibited the requisite "deliberate indifference" to constitutional rights to illustrate

a custom or policy and for municipal liability to attach to police officer's conduct. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

208. This indifference was evidenced by City officials' recognition of the effect the curfew order would have on lawful protesters and their acknowledgment that legitimate, nonviolent, constitutionally protected protesters would be harmed during enforcement of the orders.

209. The implementation of the curfew order resulted in the foreseeable and widespread use of excessive force.

210. This level of force was authorized by City officials, and the pervasiveness of the conduct illustrates a persistent and widespread custom throughout MPD of engaging in such practices as is required for a showing of municipal liability. *See Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978).

211. If the level of force used by Defendants was not expressly authorized by City officials, City officials failed to adequately instruct MPD officers as to what level of force (including use of chemical irritants) was warranted or unwarranted in responding to mass demonstrations between May 25, 2020 and May 31, 2020.

212. City officials failed to adequately instruct MPD officers as to how to enforce curfew orders and failed to adequately instruct MPD officers

about the many exceptions to the curfew order(s) while such curfew orders were in effect.

213. City officials failed to adequately supervise MPD officers to ensure excessive force was not being used during the City's response to mass demonstrations between May 25, 2020 and May 31, 2020.

214. City officials failed to adequately supervise MPD officers to ensure they were not violating MINN. STAT. §§ 629.33 and 629.32 during the City's response to mass demonstrations between May 25, 2020 and May 31, 2020.

215. City officials failed to adequately discipline MPD officers for their clear and well-known uses of excessive force in the days leading up to May 31, 2020.

216. City officials failed to adequately discipline MPD officers for their clear and well-known uses of excessive force generally (without regard to mass demonstration response) prior to May 31, 2020.

217. Despite their knowledge of MPD's customs and practices, Minneapolis officials, including Frey and Arradondo, failed to implement measures to address them. As a result, the abuses including, but not limited to, those set forth above occurred during the implementation of the Minneapolis curfew orders.

218.  The pervasive use of excessive force, including the use of rubber bullets, paint canisters, and tear gas against unarmed civilians, was widely reported by media and addressed by city and state officials in press conferences indicating they were well aware of the violations, yet police violence continued, and perhaps escalated, throughout the period between May 28, 2020 and May 31, 2020.

219.  The force authorized and the curfew order itself were facially unconstitutional as their immense breadth and failure to permit alternative forms of expression rendered them improper limitations of fundamental rights.

220.  "A municipality has no immunity from liability under § 1983 flowing from its constitutional violations and may not assert the good faith of its officers as a defense to such liability." *Owen v. City of Independence*, 445 U.S. 622, 622 (1980). Accordingly, Minneapolis's municipal liability must attach because the policies themselves were unconstitutional.

221.  Ericka suffered serious harm as a direct and proximate result of Defendants' actions including, but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

## Count 6: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Ericka's Fundamental Right to Freedom of Movement and Presence in Public

### (Plaintiff v. Minneapolis, Doe 1 & Doe 2)

222.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

223.   Defendants' above-described conduct violated Ericka's rights to be present in public under the Fourteenth Amendment to the United States Constitution. *City of Chicago v. Morales*, 527 U.S. 41, 53, (1999).

224.   By criminalizing the public presence of each and every Minneapolis resident or visitor for nearly half of the day, for three days running, Mayor Frey's emergency regulation unduly burdened the fundamental rights of some 416,000 Minneapolis residents, many of whom lived nowhere near the sites of unrest centered around Lake Street on the City's south side and Broadway Avenue on the north.

225.   The massive overbreadth of this order renders it facially unconstitutional due to the enormous scale of constitutional infringements and its effect on the rights of more than 100,000 Minneapolis residents whose neighborhoods were entirely untouched by the unrest in the wake of George Floyd's killing.

226. The massive overbreadth of this order also renders it facially unconstitutional as applied to Ericka.

227. Mayor Frey's order was implemented on behalf of Defendant Minneapolis and enforced by Chief Arradondo and Does 1 and 2.

228. As a direct and proximate result of the enforcement of Mayor Frey's unconstitutional emergency regulation, Ericka suffered serious harm including, but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

229. As a direct and proximate result of Mayor Frey's order, Ericka also suffered a constitutional injury in the form of a limitation on her fundamental right to remain in public for innocent purposes.

230. Thus, Defendants violated the First Amendment and 42 U.S.C. § 1983.

## Count 7: 42 U.S.C. § 1983 – First Amendment Violation of Ericka's Rights to Freedom of Speech and Assembly

(Plaintiff v. Minneapolis)

231. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

232. Defendants' above-described conduct violated Plaintiff's rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution.

233.   Emergency Regulation 2020-2-2 was simply too broad to satisfy the strictures of constitutional inquiry.

234.   Defendants' interest in maintaining order could have been adequately served by measures implicating far less onerous constitutional limitations than the sweeping curfew orders employed.

235.   As outlined above, the unrest and fires that prompted Mayor Frey's order were confined to the area around the Third Precinct, along Lake Street on the City's south side and along Broadway Avenue on the City's north side. Between and around these areas, much of the City was relatively calm and a sweeping order was unnecessary.

236.   Because Mayor Frey's order implicated rights secured under both the First and Fourteenth Amendments and because other options such as simply deploying the National Guard or administering a more localized ban on activity in affected areas offered less rights-restrictive alternatives, Mayor Frey's emergency declaration imposing a City-wide curfew was not properly tailored to Defendants' interests and it cannot withstand a constitutional challenge.

237.   Because the curfew order was specifically intended to suppress speech during certain hours, it swept up a substantial amount of legitimate speech unrelated to the restoration of order, and it left few if any

alternative avenues for expression available, particularly for those like Ericka who work during the day.

238. Mayor Frey's emergency curfew order constituted an unconstitutional limit of Ericka's First Amendment rights under the "time, place and manner" analysis.

239. As a direct and proximate result of the enforcement of Mayor Frey's unconstitutional emergency regulation, Ericka suffered serious harm including, but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

240. As a direct and proximate result of Mayor Frey's order, Ericka also suffered a constitutional injury in the form of a limitation on her fundamental right to speak, assemble with like-minded protesters, and seek redress for grievances involving MPD.

241. Thus, Defendants violated the First Amendment and 42 U.S.C. § 1983.

## Count 8: Minn. Stat. § 466.02 – Battery

(Plaintiff v. Minneapolis, Doe 1 & Doe 2)

242. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

243. Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

244. Minnesota Law defines the tort of battery "as an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

245. Officer Doe 1 or 2 committed such a battery when one of them intentionally and without permission reached across Ericka's body, grabbed her right shoulder, and pulled her from the car. This offensive contact then caused Ericka to fall to the pavement, injuring her knee.

246. Officers Doe 1 and 2 willfully or maliciously apprehended Ericka in a manner that violated her constitutional rights, and which violated the plain language of MINN. STAT. §§ 629.33 and 629.32. *See generally Soucek v. Banham*, 503 N.W.2d 153, 160-63 (Minn. Ct. App. 1993).

247. Because Officer Doe 1 and/or 2 acted intentionally and with reason to believe that using such force on an unarmed misdemeanant without warning or provocation was legally prohibited, they are not entitled to official immunity.

248. Minnesota law holds that "every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a

governmental or proprietary function." MINN. STAT. § 466.02. This is
subject to several exceptions including, pertinently, "claim[s] based
upon an act or omission of an officer or employee, *exercising due care*,
in the execution of a valid or invalid statute, charter, ordinance,
resolution, or rule." *Id.* at subd. 5 (emphasis added).

249.   As Officer Doe 1 or 2 failed to exercise due care when they forced
       Ericka from her vehicle without warning, municipal Defendant
       Minneapolis is not exempt from liability for Officers Doe. *See*
       *Craighead v. Lee*, 399 F.3d 954, 963 (8th Cir. 2005) (applying Minn.
       law) (precluding summary judgment granting immunity to either
       municipality or officer where decision turned on disputed fact
       determination).

250.   As a direct and proximate result of Doe Defendant 1 or 2's actions,
       Ericka suffered serious harm including but not limited to, physical
       injury, financial injury, emotional trauma, loss of access to justice,
       and pain and suffering.

251.   Thus, Defendants committed an actionable intentional tort under
       Minnesota law.

## Count 9: Minn. Stat. § 466.02 – Negligence

(Plaintiff v. Minneapolis, Doe 1 & Doe 2)

252.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

253.   Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

254.   In forcibly removing Ericka from her vehicle, deploying tear gas, and applying unreasonably tight restraints, Doe Defendants "fail[ed] to act as a reasonable and prudent police officer in the same or similar circumstance." *Kari v. City of Maplewood*, 582 N.W.2d 921, 924 (Minn. 1998).

255.   Officers Doe 1 and 2 owed Ericka the duty of apprehending her in a constitutionally reasonable manner.

256.   Officers Doe 1 and 2 owed Ericka a duty not to unnecessarily harm her in the execution of her arrest.

257.   Officers Doe 1 and 2 owed Ericka a duty to comply with MINN. STAT. §§ 629.33 and 629.32.

258.   Officers Doe 1 or 2 breached each of these duties when he or she pulled Ericka from her car and pushed her to the pavement.

259. Officers Doe 1 or 2 breached each of these duties when he or she deployed tear gas while Ericka was compliant and nonthreatening.

260. Officers Doe 1 or 2's failure to comply with MINN. STAT. §§ 629.33 and 629.32 constitutes negligence *per se*.

261. Officers Doe 1 and 2 willfully or maliciously apprehended Ericka in a manner that violated her constitutional rights, and which violated the plain language of MINN. STAT. §§ 629.33 and 629.32. *See generally Soucek v. Banham*, 503 N.W.2d 153, 160-63 (Minn. Ct. App. 1993).

262. As a direct and proximate result of Doe Defendant 1 and/or 2's actions, Ericka suffered serious harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

263. Thus, Defendants committed an actionable negligence tort under Minnesota law.

## Count 10: Minn. Stat. § 466.02 – Negligent Infliction of Emotional Distress

(Plaintiff v. Minneapolis, Doe 1 & Doe 2)

264. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

265.  Supplemental jurisdiction is proper given that this claim arises from a
      "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S.
      725 (1966).

266.  The tort of negligent infliction of emotional distress is established
      when a plaintiff "is within a zone of danger of physical impact,
      reasonably fears for his or her own safety, and consequently suffers
      severe emotional distress with resultant physical injury." *Bohdan v.
      Alltool Mfg., Co.*, 411 N.W.2d 902, 907 (Minn. Ct. App. 1987).

267.  In forcibly removing Ericka from her vehicle and deploying tear gas,
      Officer Doe 1 or 2 placed her directly in such a "zone of danger."
      Ericka feared for her safety as a result of the officer's actions, and she
      suffers emotional distress as a result of the incident.

268.  Further, Officers Doe 1 and 2 willfully or maliciously apprehended
      Ericka in a manner that violated her constitutional rights, which
      provides an exemption to the "zone of danger" requirement in
      establishing negligent infliction of emotional distress. *Bohdan*, 411
      N.W.2d at 902 (citing *State Farm Mut. Auto. Ins. Co. v. Village of Isle*,
      122 N.W.2d 36, 41 (Minn. 1963).

269.  As a direct and proximate result of Defendants' actions, Ericka
      suffered serious harm including but not limited to, physical injury,

financial injury, emotional trauma, loss of access to justice, and pain and suffering.

270. Thus, Defendants committed an actionable tort of negligent infliction of emotional harm under Minnesota law.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A. Issue a declaratory judgment stating that Emergency Regulation 2020-2-2 is unconstitutional under the First Amendment to the United States Constitution.

B. With regards to claims 1, 2, 3, 4, 6, and 7 (§1983 claims), grant an award of compensatory damages totaling $100,000 against one or more Defendants as compensation for Defendants' actions which caused Ericka to experience pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries.

C. With regard to claim 5 (*Monell* claim), grant an award of compensatory damages totaling $100,000 against Defendant Minneapolis as compensation for Defendants' actions which caused Ericka to experience pain and suffering, substantial emotional and psychological

damages, substantial bodily harm, and significant constitutional
injuries.

D.    With regards to claims 1, 2, 3, 4, 6, and 7 (§1983 claims), grant an
award of punitive damages in the amount of $500,000, respectively,
against Doe Defendants 1 and 2 (in their individual capacities) as a
consequence for their reckless and callous indifference towards Ericka's
rights under the U.S. Constitution and Minnesota law, and to deter
other members of MPD from committing similar grievous offenses in
the future.

E.    With regards to claims 1, 2, 3, 4, 5, 6, and 7 (§1983 & *Monell* claims),
grant an award of reasonable attorneys' fees, non-taxable expenses and
costs pursuant to 42 U.S.C. § 1988, or under any other relevant
attorney fee statute.

F.    With regards to claims 8, 9, and 10 (state law claims), grant an award
of compensatory damages totaling $100,000 against Doe Defendants 1,
2 (or Defendant Minneapolis under MINN. STAT. § 466.02 or MINN.
STAT. § 3.736), or any combination thereof, as compensation for
Defendants' actions which caused Ericka to experience pain and
suffering, substantial emotional and psychological damages,
substantial bodily harm, and significant constitutional injuries.

G.   Permanently enjoin the City of Minneapolis from deploying chemical
     irritants against suspected misdemeanants who have not used or
     attempted to use force against any person.

H.   Grant such other relief as may be just and reasonable.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues which may be tried by a jury pursuant to Rule 38 of the Federal Rules of Procedure.

DATED: November 13, 2020            Respectfully submitted,

                                    */s/ Nico Ratkowski*

                                    NICO RATKOWSKI
                                    MN Attorney ID: 0400413
                                    Contreras & Metelska, P.A.
                                    200 University Avenue W., STE 200
                                    Saint Paul, Minnesota 55103
                                    P: (651) 771-0019
                                    F: (651) 772-4300
                                    nico@contrerasmetelska.com

                                    ANU JASWAL
                                    MN Attorney ID: 0401299
                                    Contreras & Metelska, P.A.
                                    200 University Avenue W., STE 200
                                    Saint Paul, Minnesota 55103
                                    P: (651) 771-0019
                                    F: (651) 772-4300
                                    anu@contrerasmetelska.com

                                    *Attorneys for Plaintiff*

## <u>VERIFICATION OF COMPLAINT</u>

Nico Ratkowski, under penalty of perjury, states the following:

1. That he is an attorney employed by Contreras & Metelska, PA, the attorneys for Plaintiff in this case.

2. That he affirms the truth of the contents thereof upon information and belief, and he believes same to be true, and he further states that the sources of this information and belief are documents provided to him by Plaintiff, Defendant(s), and third-party witnesses.

DATED: November 13, 2020         Respectfully submitted,

<u>/s/ *Nico Ratkowski*</u>
Nico Ratkowski
MN Attorney ID: 0400413
Contreras & Metelska, P.A.
200 University Avenue W., STE 200
Saint Paul, Minnesota 55103
P: (651) 771-0019
F: (651) 772-4300
nico@contrerasmetelska.com

*Attorney for Plaintiff*